**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Honorable Marcia S. Krieger**

Civil Action No. 11-cv-00640-MSK

**SILVANA V. LAFFERTY,**

   **Plaintiff,**

**v.**

**CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration,**

   **Defendant.**[1]

---

### OPINION and ORDER

---

  **THIS MATTER** comes before the Court on Plaintiff  Silvana V. Lafferty's appeal of the

Commissioner of Social Security's final decision denying her application for Disability

Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33.  Having

considered the pleadings and the record, the Court

  **FINDS** and **CONCLUDES** that:

### I.  Jurisdiction

  Ms. Lafferty filed a claim for disability insurance benefits pursuant to Title II.  She

asserted that her disability began on August 8, 2006.  After her claim was initially denied, Ms.

Lafferty filed a written request for a hearing before an Administrative Law Judge ("ALJ").  This

request was granted and a hearing was held on February 23, 2009.

---

[1]  At the time Ms. Lafferty filed her initial appeal, Michael J. Astrue was the Commissioner of
Social Security.  Carolyn W. Colvin is substituted as the Defendant in this action to reflect her
designation as Acting Commissioner of Social Security, effective February 14, 2013.

After the hearing, the ALJ issued a decision, which found that Ms. Lafferty met the insured status requirements through December 31, 2011.  The Decision also found that: (1) Ms. Lafferty had not engaged in substantial gainful activity since December 8, 2006; (2) her degenerative disk disease was a severe impairment; (3) she did not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpt. P, Appx. 1 ("the Listings"); and (4) Ms. Lafferty had the residual functional capacity ("RFC") to perform all work-related activities with the following limitations: lifting and carrying 10 pounds frequently and 20 pounds occasionally; sitting for a total of 8 hours in an 8 hour workday; standing or walking for four hours at a time and no more than six hours in an eight hour workday; and occasionally stooping, kneeling and crouching.  Based on this RFC finding, the ALJ ultimately found that Ms. Lafferty was not disabled because she was capable of performing her past relevant work as a route delivery driver, produce clerk and security guard.

The Appeals Council denied Ms. Lafferty's appeal from the Decision and Ms. Lafferty appealed to this Court.  Based on the Appeals' Council's failure to consider new evidence, this Court remanded Ms. Lafferty's case for further administrative proceedings pursuant to sentence six of 42 U.S.C. § 405(g).

Ms. Lafferty filed a second application for disability insurance benefits on September 10, 2009.  Based on this application, the Colorado Disability Determination Services found that Ms. Lafferty was disabled commencing March 27, 2009.  The Appeals Council affirmed the state agency's determination, but instructed the ALJ, considering the additional evidence and this Court's remand order, to determine whether Ms. Lafferty was disabled prior to March 27, 2009.

The ALJ held a second hearing on September 19, 2012, and subsequently issued a Second Decision. The findings in the Second Decision were identical to the findings in the original Decision, with limited exceptions. The Second Decision corrected an error by finding that Ms. Lafferty's asserted disability began on August 8, 2006, not December 8, 2006. The Second Decision also adopted the vocational expert's testimony at the second hearing that Ms. Lafferty had worked as a chauffeur rather than a route delivery driver. At Step 4, the Second Decision found that Ms. Lafferty was not disabled because she could still perform her past work as a chauffeur and security guard.

The Appeals Council denied Ms. Lafferty's appeal from the Second Decision. Consequently, the Second Decision is final for purposes of judicial review. *Krauser v. Astrue*, 638 F.3d 1324, 1327 (10th Cir. 2011). Mr. Lafferty's appeal was timely brought, and this Court exercises jurisdiction to review the Commissioner of Social Security's final decision pursuant to 42 U.S.C. § 405(g). The sole issue is whether Ms. Lafferty was disabled prior to March 27, 2009.

## II.    Material Facts

The material facts are as follows.

Ms. Lafferty was born in Italy in 1954 but moved to the United States in 1977. She speaks English fluently, but cannot read or write in English and her education was limited to the fourth grade. Her past work includes chauffeur, security guard and produce stock clerk. She asserts that she is disabled due to degenerative disk disease and depression.

### A. Degenerative Disk Disease

#### i. Medical Tests

Included in the medical record are four MRI's of Ms. Lafferty's lumbar spine. The first, from May 2004, showed moderate to severe degenerative disk disease, prominent disk osteophyte formation but no neural foraminal narrowing. The second, taken in July 2006, showed: at the L2-L3 level, a left posterolateral 3mm disk protrusion; at the L3-L4 level, right posterolateral 6mm AP x 1.7 cm disk herniation in which disk material extruded into the right neural foramen and likely affected the right L3 nerve root; at the L4-L5 level, a posterior 2mm disk bulge with right neural foraminal canal narrowing; and at the L5-S1 level, broad-based posterior 2mm disk bulge with a probable retroaortic left renal vein. The third, from October 2007, showed: at the L3-L4 level, slight loss of disk height and signal at L3-L4, right lateral disk protrusion contacting the right L3 nerve root at lateral disk margin as well as ligamentum flavum thickening and facet arthrosis contributing to mild central canal stenosis in combination with developmental narrowing of central canal; at the L4-L5 level, developmental narrowing of the central canal, ligamentum flavum thickening and facet arthrosis as well as mild central canal stenosis; and at the L5-S1 level, mild developmental narrowing of the central canal. Finally, the fourth, from January 2009, showed: at the L3-L4 level, mild degenerative disk disease not significantly changed from the October 2007 MRI, congenital narrowing of the central canal due to short pedicles, mild foraminal narrowing and mild disk bulge superimposed on congenitally narrowed central canal resulting in central canal stenosis; and at both the L4-L5 and L5-S1 levels, mild disk bulge superimposed on congenitally central canal contributing to mild central canal stenosis and mild facet hypertrophic changes causing mild foraminal narrowing.

### ii.   Dr. Domaleski

Dr. Domaleski was Ms. Lafferty's treating physician from 2005 through 2009.  As part of his evaluation and treatment of Ms. Lafferty's medical problems, he reviewed the MRI's described above.  Additionally, he performed numerous physical examinations and treated Ms. Lafferty for back pain, shoulder pain and depression.  Dr. Domaleski's physical examinations ranged from simple palpitations of Ms. Lafferty's back muscles to complete tests of Ms. Lafferty's musculoskeletal system.  Often, but not always, Ms. Lafferty had pain in several areas, including her lower back.  For example, in September 2007, Ms. Lafferty had pain when her lower lumbosacral spine was palpated, and had slight pain during a straight leg test.  In February and October 2007, Ms. Lafferty had pain during palpation of her lower lumbosacral spine, but no pain during a straight leg raising test.  In July 2008, Ms. Lafferty complained of lower back pain, but did not have pain during palpation of her lower lumbosacral spine.  In October 2008 Dr. Domaleski's assessment was that Ms. Lafferty was suffering from chronic pain.  Results from an extensive physical exam performed in February 2009 were largely normal.  Ms. Lafferty had normal range of motion, straight leg and Waddell's tests.  However, she did have tenderness in the iliolumbar region of her spine and three fibromyalgia points.  Contemporaneous x-rays showed toggling at the L3-L4 levels.  In April 2009, Ms. Lafferty complained of severe lower back pain, but palpation over her lower lumbosacral spine was not painful.

Based on his treatment of Ms. Lafferty, as well as the MRI's, x-rays and bone density tests he reviewed, Dr. Domaleski completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) in February 2009.  According to Dr. Domaleski, Ms. Lafferty was unable to lift or carry any weight, climb ladders or scaffolds, stoop, kneel, crouch or crawl.  Additionally, she was able to sit, stand and walk only 45 minutes out of an 8 hour day.  These

limits were a direct result of Ms. Lafferty's degenerative joint disease in her back combined with chronic muscle stress. Ultimately, Dr. Domaleski opined that Ms. Lafferty was unable to sustain employment 8 hours per day, 5 days per week.

### iii.   Other Treating Physicians

Ms. Lafferty was also treated by other physicians. Several also addressed an incident in which Ms. Lafferty was given an epidural injection in her lumbar spine and subsequently experienced stroke-like symptoms.

In July of 2007, Ms. Lafferty injured her lower back performing her job as a produce stocker. Dr. Zuehlsdorff treated her for this injury. According to treatment notes from late July 2006, Ms. Lafferty did not exhibit pain behavior, but told Dr. Zuehlsdorff that she had pain and spasms in her abdomen and lower spine. Physical exam results included negative straight leg and hip rotation tests but a positive Fabers' test, limited bending and extension ability, and palpatory and percussive pain in her right lumbosacral axis. On August 4, 2006, Ms. Lafferty told Dr. Zuehlsdorff that she was feeling 100%. At this time Dr. Zuehlsdorff reviewed the July 2006 MRI, which showed disk bulge and herniation at the L2-L3, L3-L4, L4-L5 and L5-S1 levels, along with possible impingement on the L3 nerve root. On August 11, she had pain in her back and right leg, along with a positive straight leg test and decreased strength. These symptoms continued throughout August, with Ms. Lafferty complaining of various levels of back and leg pain. Several straight leg tests were positive and she experienced pain with lower back palpitation. Dr. Zuehlsdorff prescribed her Valium and Percocet. On August 21, he recommended she try an epidural injection.

On August 29, 2006, Dr. Olsen gave her an epidural injection in her lumbar spine. According to his records, Ms. Lafferty experienced immediate neurological symptoms including

a right facial droop, weakness in her left arm and right hemifacial palsy.  She was taken to the emergency room.  However, CT scans and MRI images were all negative for a stroke.  According to the attending physician, Ms. Lafferty exhibited inconsistent symptoms on examination.  For instance, although she complained that the right side of her face drooped, she was able to smile using muscles on both sides of her face.

The day after her reaction to the injection, August 30, Ms. Lafferty was secretly filmed.  While it is not clear from the record why she was secretly filmed, the film was given to Dr. Zuehlsdorff and Dr. Olsen.  According to Dr. Zuehlsdorff's treatment notes, this video showed Ms. Lafferty getting in and out of her car, sweeping her steps, walking and grocery shopping with her grandchildren.

Given Ms. Lafferty's inconsistent symptoms, the lack of medical evidence supporting her stroke symptoms and the above referenced video, Dr. Zuehlsdorff and Dr. Olsen concluded that her reaction to the epidural injection had no medical basis.  According to Dr. Olsen's treatment notes from September 11, 2006, Ms. Lafferty's subjective complaints were not supported by any objective information gathered from a clinical examination.  When Dr. Olsen confronted her with the video, she stated that her left side was fine, but then asked what she should do about her back pain.  Dr. Olsen's ultimate assessment, considering the above information as well as his review of the July 2006 MRI, was a diagnosis of degenerative disk disease for which he recommended physical therapy.  However, he noted that it was "difficult to believe her complaints of lumbar pain given the fictitious presentation of left-sided weakness," and he felt she could return to work.  Similarly, Dr. Zuehlsdorff concluded that her stroke symptoms were not valid as they didn't match the physical abilities on the video or physical examination results.

Like Dr. Olsen, Dr. Zuehlsdorff felt that Ms. Lafferty needed no further treatment and could return to work.

Other treatment records from August 2006 through March 2009 address Ms. Lafferty's complaints of back pain. On August 19, 2006, Dr. Shih performed both a physical exam and an electrodiagnostic evaluation. During the physical exam, Ms. Lafferty stated she had severe pain that increased when she was bending or sitting. However, the electrodiagnostic evaluation showed no evidence of denervating lumbar radiculopathy. In October 2007, Ms. Lafferty saw Dr. Castro due to debilitating back pain. He studied the July 2006 MRI and performed a physical examination. During this examination, Ms. Lafferty had good lumbar range of motion, no limp, and was able to stand and walk on her heels and toes. X-rays taken at the time indicated mild degenerative changes at L4-L5 and L5-S1, but with fairly well maintained facet joint and disk spacing. Dr. Castro recommended injections or a microdiscectomy surgery. Dr. Kawasaki treated Ms. Lafferty for back pain from August to November 2007. During these appointments, Ms. Lafferty consistently complained of lower back pain, limped, had tenderness to palpation in her lower lumbar spine and increased pain with forward flexion and lumbar extension. However, Dr. Kawasaki's assessment was that physical therapy was her best treatment for her chronic back pain.

### iv.  Examining Physicians

Finally, Ms. Lafferty was evaluated by two physicians as part of the disability evaluation process. Dr. Perea examined her in June 2007. He reviewed her July 2006 MRI and performed a physical examination. Ms. Lafferty had normal range of motion for her lumbar spine, but pain with both flexion and extension. She had normal reflexes, strength and gait. Based on the July 2006 MRI, Dr. Perea concluded that she had some pain caused by a herniated disk, but thought it

unlikely that she had nerve root impingement.  According to Dr. Perea, Ms. Lafferty had some functional limitations due to back pain, including: lifting and carrying no more than 20 pounds occasionally or 10 pounds frequently; standing and walking no more than 6 hours in a day and 4 hours at a time; and occasional limits on bending, crouching, stooping and crawling.

Dr. Goldman performed an independent medical examination in December of 2006 and summarized his findings in a report (Exhibit 10F).  He reviewed Ms. Lafferty's medical record, including the July 2006 lumbar MRI, and administered a physical exam. Ms. Lafferty told Dr. Goldman that she took Vicodin for her pain, but limited her intake to a few times per week because it causes dizziness.  During the exam, Ms. Lafferty exhibited mild to moderate pain behaviors, with tenderness in her lower back, diminished bilateral sacroiliac motion, diminished external rotation of the right hip and positive straight leg tests.  However, she had normal gait, no active trigger points, as well as normal back flexion and extension.

Dr. Goldman also reviewed the same August 30, 2006 video Dr. Zuehlsdorff and Dr. Olsen reviewed.  He wrote in his report that Ms. Lafferty tended to lean to the left when walking and entered her car in a strange fashion (relying on her left side), which suggested right hip flexion weakness consistent with right L4 radiculopathy.  Additionally, Dr. Goldman wrote that, in the video, Ms. Lafferty ascended her stairs one at a time, did not limp while walking at home, limped while at the grocery store, had help loading and unloading groceries and did no significant lifting.  All this was consistent with mild and subtle but nonetheless progressive pain behaviors consistent with her overall complaints.  Having reviewed Dr. Raschbacher's September 2006 report, Dr. Goldman had the impression that Ms. Lafferty presented much more impaired in her doctor's office than she actually was on a day to day basis.  According to his

report, "I would imagine permanent restrictions will probably remain in a modified light work category."

### B. Depression

Ms. Lafferty testified at the first hearing that, due to depression, she took Paxil every three to four hours and had done so since February 2008.  She also testified that she does not receive counseling for her depression and none has been recommended.

Dr. Suslak performed a psychiatric evaluation on Ms. Lafferty in December 2009.  Ms. Lafferty told him that she experienced social isolation, incessant crying, fatigue, loss of interest or initiative and feelings of shame.  She was taking Paxil for her depression, but had recently switched to Wellbutrin.  Neither caused side effects.  Based on the examination, Dr. Suslak concluded that Ms. Lafferty had major depressive disorder, recurrent and severe.  He wrote that she had a markedly dysphoric affect with "frequent crying, pervasive sadness, loss of energy, feelings of worthlessness and shame, as well as diminished ability to concentrate and think."

Dr. Elsner also examined Ms. Lafferty in January 2010 for complaints of depression, in addition to back and neck pain.  After administering a mental status exam, Dr. Elsner wrote in a report that Ms. Lafferty was fully oriented, but broke down in tears towards the end of the exam and stated that she locks herself in her room and is depressed due to her back pain.  Dr. Elsner concluded that Ms. Lafferty had depression and anxiety and recommended counseling and physical therapy.  Ultimately, Dr. Elsner concluded that Ms. Lafferty could eventually return to the workforce, but at the time was unable to work because she was overwhelmed by insomnia, chronic pain and her mental health issues.

Dr. Domaleski's treatment notes occasionally referenced Ms. Lafferty's depression.  In October 2007, Dr. Domaleski prescribed Ms. Lafferty 20mg of Paxil.  This prescription was

renewed in July 2008.  In October 2008, Dr. Domaleski wrote in a treatment note that Ms.

Lafferty was still depressed due to her physical condition and was taking 20mg of Paxil per day,

which seemed to help the depression.  None of Dr. Domaleski's other treatment notes include

reference to depression, nor was depression mentioned in his December 2009 opinion.

Finally, Ms. Lafferty's mental status was occasionally mentioned in other treatment notes

and examination reports.  In October 2007, Ms. Lafferty told a treating physician, Dr. Kawasaki,

that she had increased depression.  In April 2008, Dr. Johnson wrote in a treatment note that she

had a normal mood and affect.  Based on his February 2009 examination, Mr. Menshenfriend

wrote that Ms. Lafferty "appeared to be somewhat distraught" and "upset to almost

hopelessness."

### C.  Hearing Testimony

Ms. Lafferty testified at the February 2009 hearing, but not at the 2012 hearing.  During

the 2009 hearing, she talked about the demands of her past jobs, including her work as a security

guard and chauffeur.  In her job as a bingo security guard, she carried a firearm while standing

near the cash register guarding the concession sales.  She would occasionally take cash to the

bank for deposit.  Except for these bank runs, she stood while at this job.  In her role as a security

guard at two different casinos, she checked identification and checked the parking lot.

According to her, this was a job in which she stood 8 hours per day, but she was unarmed.  These

jobs required lifting up to 15 pounds.  When describing her daily activities, she stated that she

did not do any of her household finances, as she didn't understand reading, writing or math.

At the 2012 hearing, the ALJ summarized much of this testimony (and incorporated the

rest of the 2009 transcript into the record) and then asked the vocational expert the following:

> Now, what I'd like to do is ask you a series of hypothetical questions.  For these,
> assume our individual would have been closely approaching advanced age being

54 in March, 2009, able to speak and understand English, not able to read English, and having the past work both as [Ms. Lafferty] described in her prior hearing testimony and as you've described it.  For the first question, assume the individual is able to do all work activities but with the following limitations: they can lift and carry up to 10 pounds frequently and 20 pounds occasionally; they can sit eight hours a day; they can stand or walk up to four hours at a time and a total of six hours during the day; they should only occasionally be doing stooping, kneeling, or crouching.  Would this first individual be able to perform any of Ms. Lafferty's past work either as she did it or as the work is generally performed?

The vocational expert replied:

The chauffeur work, both as generally done and described in the [Dictionary of Occupational Titles] as well as the description that was read from the transcript, and the security guard, both as generally done in the Dictionary of Occupational Titles and as described in the transcript.

**III.     Issues Presented**

Ms. Lafferty raises six challenges to the Commissioner's Decision: (1) the ALJ erred at Step 2 in finding that Ms. Lafferty did not have any mental health impairment; (2) the ALJ failed to properly weigh the opinions of Dr. Domaleksi as well as the medical evidence; (3) the ALJ erred by not finding a pain disorder for which Ms. Lafferty takes Vicodin and erred by not considering the side effects of Ms. Lafferty's medications; (4) the ALJ erred in finding that Ms. Lafferty can return to her past relevant work as a chauffeur; (5) the ALJ failed to consider Ms. Lafferty's illiteracy on her ability to perform work; and (6) the 8 hour standing or walking requirement of the security guard job exceeds the 6 hour standing or walking limitation of the RFC.  Having addressed each challenge below, the Court concludes that the Commissioner's Decision is supported by substantial evidence and free from prejudicial error.

**IV.     Standard of Review**

Judicial review of the Commissioner of Social Security's determination that a claimant is not disabled within the meaning of the Social Security Act is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by

substantial evidence. *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003); 42 U.S.C.

§ 405(g). "Substantial evidence is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). On appeal, a reviewing court's job is

neither to "reweigh the evidence nor substitute our judgment for that of the agency." *Branum v.*

*Barnhart*, 385 f.3d 1268, 1270, 105 Fed. Appx. 990 (10th Cir 2004) (*quoting Casias v. Sec'y of*

*Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). The evidence relevant to a social

security claim is the evidence after the alleged onset date and before the expiration of a

claimant's insured status. *Miller v. Barnhart*, 175 Fed.Appx. 952 (10th Cir. 2006). However,

"evidence bearing upon an applicant's condition subsequent to the date upon which the earning

requirement was last met is pertinent evidence in that it may disclose the severity and continuity

of impairments existing before the earning requirement date or may identify additional

impairments which could reasonably be presumed to have been present and to have imposed

limitations as of the earning requirement date." *Miller v. Chater*, 99 F.3d 972, 977 (10th Cir.

1996) (citation omitted).

Step 2 of the sequential disability evaluation analysis requires the ALJ to consider the

medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment

or combination of impairments is severe if it significantly limits a claimant's physical or mental

ability to do basic work activities. § 404.1521(a). Although the existence of a condition or

ailment alone is not sufficient, a claimant need only make a *de minimis* showing of impairment

to satisfy the requirements of Step 2. *Langley v. Barnhart*, 373 F.3d 1116, 1123 (10th Cir. 2004)

(*citing Bowen v. Yuckert*, 482 U.S. 137, 158, 107 S.Ct. 2287 (1987)). A Step 2 finding is based

on medical evidence alone, and does not include consideration of evidence relating to age,

education and work experience.  SSR 85-28; *Williams v. Bowen*, 844 F.2d 748 (10th Cir. 1988);

§ 404.1508 ([a] physical or mental impairment must be established by medical evidence

consisting of signs, symptoms and laboratory findings, not only by your statement of symptoms).

Step 4 of the sequential analysis is comprised of three phases.  *Winfrey v. Chater*, 92 F.3d

1017, 1023 (10th Cir. 1996).  "In the first phase, the ALJ must evaluate a claimant's physical and

mental residual functional capacity (RFC)…, and in the second phase, he must determine the

physical and mental demands of the claimant's past relevant work."  *Winfrey*, 92 F.3d at 1023

(citing 20 C.F.R. § 404.1520(e)).  "In the final phase, the ALJ determines whether the claimant

has the ability to meet the job demands found in phase two despite the mental and/or physical

limitations found in phase one."  *Id*.  "At each of these phases, the ALJ must make specific

findings."  *Id*.

When evaluating medical opinions, a treating physician's opinion must be given

controlling weight if it is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

record."  20 C.F.R. § 404.1527(c)(2).  The ALJ must give specific and legitimate reasons to

reject a treating physician's opinion or give it less than controlling weight.  *Drapeau v.*

*Massanari*, 255 F.3d 1211 (10th Cir. 2001).  Even if a treating physician's opinion is not entitled

to controlling weight, it is entitled to deference and must be weighed using the following factors:

> 1) the length of the treatment relationship and the frequency of examination;
> 2) the nature and extent of the treatment relationship, including the treatment
> provided and the kind of examination or testing performed;
> 3) the degree to which the physician's opinion is supported by relevant evidence;
> 4) consistency between the opinion and the record as a whole;
> 5) whether or not the physician is a specialist in the area upon which an opinion is
> rendered; and
> 6) other factors brought to the ALJ's attention which tend to support or contradict
> the opinion.

*Watkins*, 350 F.3d at 1300-01 (citation omitted); § 404.1527.

Having considered these factors, the ALJ must give good reasons in the decision for the weight assigned to a treating source's opinion. *Id.* The ALJ is not required to explicitly discuss all the factors outlined in 20 C.F.R. § 404.1527. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, the reasons the ALJ sets forth must be sufficiently specific to make clear to subsequent reviewers the weight the ALJ gave to the treating source's medical opinions and the reason for that weight. *Watkins*, 350 F.3d at 1301.

The ALJ is also required to assess a claimant's RFC based on all relevant evidence, medical or otherwise. 20 C.F.R. § 404.1545. As part of this evaluation, the ALJ must take into consideration all the claimant's symptoms, including subjective symptoms. § 404.1529(a). Subjective symptoms are those that cannot be objectively measured or documented. One example is pain, but there are many other symptoms which may be experienced by a claimant that no medical test can corroborate. By their nature, subjective symptoms are most often identified and described in the testimony or statements of the claimant or other witnesses.

In assessing subjective symptoms, the ALJ must consider statements of the claimant relative to objective medical evidence and other evidence in the record. § 404.1529(c)(4). If a claimant has a medically determinable impairment that could reasonably be expected to produce the identified symptoms, then the ALJ must evaluate the intensity, severity, frequency, and limiting effect of the symptoms on the claimant's ability to work. § 404.1529(c)(1); SSR 96-7p.

In the 10th Circuit, this analysis has three steps: 1) the ALJ must determine whether there is a symptom-producing impairment established by objective medical evidence; 2) if so, the ALJ must determine whether there is a "loose nexus" between the proven impairment and the claimant's subjective symptoms; and 3) if so, the ALJ must determine whether, considering all

the evidence, both objective and subjective, the claimant's symptoms are in fact disabling. *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987). The third step of the *Luna* analysis involves a holistic review of the record. The ALJ must consider pertinent evidence including a claimant's history, medical signs, and laboratory findings, as well as statements from the claimant, medical or nonmedical sources, or other persons. § 404.1529(c)(1). In addition, § 404.1529(c)(3) instructs the ALJ to consider:

1) The individual's daily activities;
2) The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3) Factors that precipitate and aggravate the symptoms;
4) The type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms…; and
7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Inherent in this review is whether and to what degree there are conflicts between the claimant's statements and the rest of the evidence. *Id*. Ultimately, the ALJ must make specific evidentiary findings[2] with regard to the existence, severity, frequency, and effect of the

---

[2] Often these findings are described as "credibility determinations". Technically, the credibility assessment is as to particular testimony or statements. But this characterization often improperly leads ALJs and claimants to focus upon whether the claimant is believable or "telling the truth". Such focus is reflected in ALJ references to the "claimant's credibility" and claimants' frequent umbrage on appeal at findings that suggest that they were untruthful.

Greater precision in distinguishing between the credibility of particular testimony as compared to general credibility of a claimant is helpful for subsequent review. It is also worth recognizing that determining the ontological truth or falsity of a claimant's statements is rarely necessary. Indeed, the searching inquiry required of the ALJ assumes that the claimant experiences a symptom that cannot be objectively documented – pain, confusion, ringing in the ears, tingling, nausea and the like. The focus of the inquiry need not be to determine whether the claimant is truthfully reporting his or her experience, but instead to determine whether such symptom corresponds to a severe impairment and whether its nature, intensity, frequency and severity

subjective symptoms on the claimant's ability to work.  § 404.1529(c)(4).  This requires specific

evidentiary findings supported by substantial evidence.  *Huston v. Bowen*, 838 F.2d 1125, 1133

(10th Cir. 1988); *Diaz*, 898 F.2d at 777.

In the administrative review process, harmless error is applied with caution.  *Fischer-*

*Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005).  Harmless error may be appropriate where,

based on material the ALJ considered, the court can confidently say that no reasonable

administrative fact-finder, following the correct analysis, could have resolved the factual matter

in any other way.  *Id.*

## V.     Discussion

### A. Depression

At Step 2, the ALJ found that Ms. Lafferty's depression was not a severe impairment

from August 8, 2006, to March 26, 2009.  Ms. Lafferty argues that the evidence supports a

finding that her depression was a severe impairment during that time.

As noted above, the question in this case is whether Ms. Lafferty was disabled from

August 8, 2006 to March 26, 2009.  Thus, the medical evidence must establish that Ms. Lafferty

was disabled during this time period.  Ms. Lafferty cites to Dr. Suslak and Dr. Elsner's

evaluations in support of her assertion that her depression was a severe impairment prior to

March 2009.  However, these reports were generated in December of 2009 and February of 2010

and there is no indication that the functional limitations outlined in each apply retroactively to

March of 2009.  Although evidence generated after the disability period can "disclose the

severity and continuity of impairments" present during the disability period, the evidence in this

---

affects the claimant's ability to work.  *See e.g. Diaz v. Sec. of Health and Human Servs.*, 898
F.2d 774, 777 (10th Cir. 1990)

case does not support an inference that the limits outlined in Dr. Suslak and Dr. Elsner's evaluations were in existence prior to March 2009.  *Miller*, 99 F.3d at 977.

Ms. Lafferty was diagnosed with depression in 2007 and consistently prescribed Paxil, but while receiving such treatment the records do not reflect any significant functional impairment prior to March 2009.  During 2008, Ms. Lafferty's depression was well addressed with her medication.  Although Mr. Menshenfriend wrote in February 2009 that Ms. Lafferty "appeared to be somewhat distraught" and "upset to almost hopelessness," he did not include any limits related to depression in his report.  Similarly, Dr. Domaleski's treatment notes from early 2009 do not include any observations regarding Ms. Lafferty's depression.  Because there is little medical evidence that supports Ms. Lafferty's assertion that her depression was a severe impairment prior to March 2009, the Court finds that the ALJ's determination that Ms. Lafferty's her depression was not a severe impairment prior to March 2009 to be supported by substantial evidence.

### B.  Dr. Domaleski's Opinion

The ALJ gave no significant weight to Dr. Domaleski's medical opinion.  Ms. Lafferty contends this was error.  According to the ALJ, Dr. Domaleski's opinion was contradicted by his treatment notes, other treatment records (including MRI's) and the medical opinions of Drs. Olsen, Zuehlsdorff, Goldman and Perea.  Ms. Lafferty argues that the ALJ failed to consider length of Dr. Domaleski's treatment in evaluating Dr. Domaleski's opinion.  Given the evidence in the record, the Court concludes that the ALJ's finding is supported by substantial evidence.

Dr. Domaleski's opinion is contradicted by a significant amount of the objective evidence in the record as well as several medical opinions.  While the various MRI's taken between 2006 and 2009 show some degenerative disk disease, none indicate physical problems that correlate

with the level of physical impairment Dr. Domaleski set forth in his opinion.  Mild to moderate canal stenosis, foraminal narrowing, disk bulge and nerve contact were seen in these MRI's. However, there was no nerve root compression.  When compared to the 2007 MRI, the 2009 MRI was very similar, with no further disk degeneration.  During physical examinations performed by Dr. Domaleski in 2007, 2008 and 2009, Ms. Lafferty routinely exhibited normal or only mildly limited functional capacity.  An August 2006 electrodiagnostic evaluation performed by Dr. Shih showed no evidence of lumbar radiculopathy, and Dr. Castro's October 2007 physical examination had normal results.

Dr. Domaleski's opinion also conflicts with the opinions of other treating physicians.  Dr. Olsen and Dr. Zuehlsdorff both examined Ms. Lafferty in 2006 for her back impairment and, having reviewed video evidence of her functional capacity in addition to the medical evidence, concluded that the symptoms and limitations she presented while at the doctor's office were not valid.  Dr. Goldman and Dr. Perea found that Ms. Lafferty had some impairment, but that it was not as severe as she alleged and she had the ability to work in a limited capacity.  As a whole, the above examination results and medical opinions form substantial evidence that supports the finding that Dr. Domaleski's opinion was entitled to no significant weight.

**C. The RFC Finding**

In formulating the RFC finding, the ALJ considered both the medical evidence in the record and Ms. Lafferty's statements about her subjective symptoms.  Although somewhat disjointed, Ms. Lafferty's third challenge essentially argues that the ALJ failed to include the effects of her pain, the side effects of two medications (Paxil and Vicodin), Dr. Goldman's observations that she had an antalgic gait and climbed one stair at a time, and Dr. Perea's limitation on her ability to bend and crawl in the RFC.

### Statements About Her Subjective Symptoms

At the heart of Ms. Lafferty's argument is her disagreement with the weight given her statements about her subjective symptoms?  The ALJ found that Ms. Lafferty had several impairments that could reasonably be expected to cause her pain and medication side effects, but that her statements regarding the intensity, persistence and limiting effect of these symptoms were not credible.  The ALJ then found that both the objective medical evidence and her history of exaggerating symptoms diminished the persuasiveness of her statements about her subjective symptoms.  This finding is consistent with the requirements of *Luna* and is supported by substantial evidence.

The Decision specifically considered both Ms. Lafferty's statements about her pain and the side effects of her medication: at Step 2, the ALJ wrote "while [Ms. Lafferty] reported having some sleepiness as a side effect of Paxil, the medical treatment records do not document reports of any such medication side effects to physicians"; when formulating the RFC, the ALJ summarized her testimony about the limiting effects of her pain and wrote "[Ms. Lafferty] takes Vicodin about three times a week for her pain and [she] does not take it more often because of her heart condition."  The ALJ then summarized the medical evidence, including physical examination results, MRI's and medical opinions, that contradicted Ms. Lafferty's assertions about the limiting effects of her symptoms.  The ALJ focused heavily upon the medical opinions from Drs. Olsen, Zeuhlsdorff and Raschbacher, all of whom expressed doubt as to the validity of Ms. Lafferty's pain and other symptoms, given the conflict between her statements and the medical and documentary evidence.  Given these opinions, as well as the contradictory evidence in the record, substantial evidence supports the ALJ's finding that Ms. Lafferty's statements

about her subjective symptoms were not entirely credible and, therefore, did not warrant inclusion as additional RFC limitations.

### 1. Dr. Goldman and Dr. Perea's Opinions

In the RFC, the ALJ limited Ms. Lafferty to lifting and carrying 10 pounds frequently and 20 pounds occasionally, sitting 8 hours in an 8 hour workday, standing and walking 4 hours at a time and 6 hours total in an 8 hour workday, and occasionally stooping, kneeling and crouching. Ms. Lafferty also contests the ALJ's omission of limitations related to her antalgic gait, her inability to climb stairs more than one at a time and her limited ability to bend and crawl from the RFC.

Although the RFC did not include limitations specifically reflecting an antalgic gait or the inability to climb stairs more than one at a time, it clear why such limitations were not adopted. The evidence supporting Ms. Lafferty's asserted antalgic gait and limited ability to climb stairs is Dr. Goldman's December 2006 evaluation. In it, Dr. Goldman mentions Ms. Lafferty's antalgic gait and observes that she climbs her front steps one at a time. *See* Exhibit 10F at 12-17. However, he ultimately concludes that "I would imagine permanent restrictions will probably remain in a modified light work category." The ALJ drew upon this language to conclude that, although Dr. Goldman observed pain behaviors (like taking the stairs one at a time and antalgia) consistent with her overall complaints, she was still able to work at the modified light duty level. Because these limitations did not limit her ability to work beyond the level outlined in the RFC, the ALJ's omission of these limitations was reasonable.

Turning to Dr. Perea's opinion, the ALJ listed the specific limitations Dr. Perea outlined in his opinion, gave the opinion significant weight, and incorporated most of its limitations into the RFC finding. While it is clear that the ALJ based the RFC finding on Dr. Perea's opinion,

the ALJ omitted two aspects of Dr. Perea's opinion (occasional bending and crawling) and included a limitation Dr. Perea did not include in his opinion (kneeling).  The reference in the Second Decision to Ms. Lafferty's June 2009 knee injury explains the inclusion of a kneeling limitation.  However, there is no explanation in the Second Decision for the omission of Dr. Perea's limitations on bending and crawling.

Although the ALJ cannot pick and choose among limitations in a medical opinion, taking only those that are favorable to a finding of disability, *see Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007), any error in the ALJ's omission was harmless.  The overt similarity between the motion involved in both bending and stooping renders the omission of one or the other from the RFC inconsequential.[3]  Similarly, the RFC's limit on kneeling encompasses the omitted limitation of crawling.  If a person is limited to occasional kneeling (and stooping for that matter), it follows that they would be limited to only occasional crawling, which involves the use of the knees and elbows for support (as well as a certain amount of stooping).  Because actions fundamental to crawling (kneeling and stooping) were included in the RFC, the omission of crawling was harmless.  *See Fischer-Ross*, 431 F.3d at 733.

### C.  Past Relevant Work

At Step 4, the ALJ found that Ms. Lafferty was not disabled because she was still able to return to her past work as a chauffeur or security guard.  In her fourth, fifth and sixth challenges, Ms. Lafferty disputes this finding, arguing that: her chauffeur job was performed more than 15 years prior to the date the Second Decision was issued; her chauffeur job did not constitute substantial gainful activity; the ALJ failed to explain why the vocational expert at the 2009 hearing characterized Ms. Lafferty's driving job as a route delivery driver when the vocational

---

[3] "Stoop" is defined as "to bend the body or a part of the body forward and downward…," while "bend" is defined as "to incline the body…."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 106, 1155 (10th ed. 2001).

expert at the 2012 hearing characterized this same job as a chauffeur; and the ALJ did not consider various factors that limited her ability to perform her jobs, including her illiteracy and difficulty with math, the requirement that a security guard stand for 8 hours, and her use of a gun in her past work as a security guard.

Turning first to the ALJ's analysis of Ms. Lafferty's ability to perform her past work as a security guard, it is important to frame Ms. Lafferty's challenge in terms of the required Step 4 analysis. As outlined above, at Step 4 the ALJ must make three findings: the claimant's RFC, the demands of the claimant's past work, and whether the claimant can meet those demands, considering the RFC finding and his or her vocational profile. *Winfrey*, 92 F.3d at 1023. In order to establish the demands of a claimant's past work and whether a claimant can meet those demands, the ALJ will often elicit the testimony of a vocational expert. Here, the ALJ asked a vocational expert a hypothetical question, inquiring whether a person with Ms. Lafferty's limitations and vocational profile could perform her past work. Based on this hypothetical question, as well as a review of documentary evidence and Ms. Lafferty's 2009 testimony about her work history, the vocational expert testified that a person with Ms. Lafferty's limitations and vocational profile would be able to perform her past jobs as a security guard.

Ms. Lafferty argues that the ALJ did not incorporate her illiteracy and difficulty with math into the hypothetical question, thus undermining the Step 4 analysis. However, just before posing the first hypothetical question, the ALJ told the vocational expert to consider a woman with Ms. Lafferty's limitations and vocational profile. The ALJ specifically referred to Ms. Lafferty's illiteracy and also referred to description of her past jobs and daily activities at the 2009 hearing, which included her statements about her difficulty with math. The ALJ clearly incorporated these limitations in the first hypothetical question. The vocational expert's

response to this hypothetical (that Ms. Lafferty could perform her past work as a security guard) implicitly incorporated her illiteracy and difficulty with math.

Ms. Lafferty also argues that the limits the ALJ included in the hypothetical question did not match Ms. Lafferty's description of her security guard duties or the Dictionary of Occupational Title's (DOT) description of the work required of a security guard.  In terms of the Step 4 analysis, the limits outlined in the ALJ's hypothetical must not conflict with the requirements of the claimant's past work.  SSR 00-4p.  If the two conflict, then the vocational expert must explain the conflict.  *Id*.  Testimony elicited from a vocational expert who fails to resolve this type of conflict cannot be a basis to deny disability.

Ms. Lafferty is correct that the limitations set out in the ALJ's first hypothetical to the vocational expert do not match the duties of a security guard set out in the DOT (in particular the 8 hour standing requirement).  However, those limitations match with Ms. Lafferty's statements about how she performed her security guard jobs.  She testified at the 2009 hearing that she carried a weapon for one of her security guard jobs, but not the other two.  She also testified that she stood for 8 hours a day for two of her security guard jobs, but not the third.  As such, it was reasonable for the ALJ to exclude both the firearm and the 8 hour standing requirement from the hypothetical question, and no conflict exists between the ALJ's hypothetical question and the duties Ms. Lafferty performed as a security guard.

The ALJ's hypothetical question incorporated all of Ms. Lafferty's limitations (illiteracy and difficulty with math) and matched her limitations (including no firearm and a 6 hour standing limit) with her description of her security guard duties.  Based on this hypothetical question, the vocational expert testified that Ms. Lafferty could still perform past work as a security guard.  At Step 4, nothing more was required, and the Court concludes that substantial

evidence supports the ALJ's Step 4 finding that Ms. Lafferty could perform at least one past job and was therefore not disabled.

For the forgoing reasons, the Commissioner of Social Security's decision is **AFFIRMED.** The Clerk shall enter a Judgment in accordance herewith.

DATED this 30th day of January, 2014

**BY THE COURT:**

Marcia S. Krieger
United States District Judge